IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| In re: ) | |
| Georgetown Steel Company, LLC, ) | |
| ) | |
| Debtor. ) | |
| _____) | C/A No. 2:05-133-18 |
| ) | |
| Georgetown Steel Company, LLC, ) | |
| ) | **ORDER and OPINION** |
| Appellee-Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| Progress Rail Services Corporation, ) | |
| ) | |
| Appellant-Defendant. ) | |
| _____) | |

This action is before the court on appeal from the United States Bankruptcy Court, District of South Carolina. This court exercises appellate jurisdiction in this matter pursuant to 28 U.S.C. § 158(a) (West 1999). Appellant Progress Rail Services Corporation ("Progress") appeals the bankruptcy court's determination that the proceeds of certain inventory be awarded to appellee Georgetown Steel Company, LLC ("debtor").

**I.     FACTUAL BACKGROUND**

This matter arises in connection with debtor's voluntary petition for relief under Chapter 11 of Title 11 of the Bankruptcy Code, filed at 9:00 am on October 21, 2003 ("Petition Date"). Prior to the Petition Date, on October 10, 2003, debtor and Progress entered into an agreement entitled "Consignment Agreement" ("Agreement") for hot briquetted iron ("HBI"), a raw material used to make steel. The Agreement refers to the parties as consignor (Progress) and consignee (debtor), and to the HBI as consigned goods. Progress delivered the HBI to debtor's facility in Georgetown, South Carolina

beginning October 10, 2003. The Agreement specified that Progress retained title to the HBI delivered to debtor. Debtor stored the HBI in a segregated, protected location away from its other inventory, and removed and used the material on an as-needed basis. The Agreement required that once a week, debtor was to report to Progress the amount of HBI used. Debtor was to pay Progress only for that HBI that it actually used or consumed.

Among other provisions, the Agreement permitted Progress to conduct a physical inventory on any business day, subjected the HBI to the direction and control of Progress "at all times," and mandated that the goods must be returned to Progress upon its demand. (Agreement ¶¶ 5, 11.) The Agreement also provided "at any time, upon one (1) day written notice, [Progress] may terminate the Agreement." (Agreement ¶ 8.)

Progress did not file a UCC-1 financing statement to evidence its interest in the HBI in debtor's possession.

On October 20, 2003 Progress sent a written notice to debtor stating that it was terminating the Agreement effective October 21, 2003. Progress sent an additional written notice demanding reclamation of certain HBI in debtor's possession. On October 21, 2003 at 9:00am, debtor filed its voluntary petition for relief under Chapter 11. Debtor is operating its business and managing its properties as debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) - 1108. A dispute arose as to who was entitled to the unused HBI, and debtor, as debtor-in-possession, commenced an adversary proceeding against Progress to determine ownership of the material.

After the petition date the price of HBI was expected to drop, so debtor and

Progress entered into a Stipulation which provided for the sale of the HBI in debtor's possession. The Stipulation also provided that the court would resolve all claims and disputes regarding the ownership of the HBI proceeds. The HBI sale generated $1,381,435.00, which is currently held in trust pending the outcome of this action. At issue is whether debtor or Progress is entitled to these proceeds.

## II.     PROCEDURAL BACKGROUND

On September 30, 2004 the bankruptcy court entered an order finding that the Agreement between debtor and Progress was a consignment transaction as defined by Article 9 of the Alabama Commercial Code, as opposed to a sales transaction governed by Article 2 of the Code.[1]  In light of this finding, the court instructed the parties to submit proposed orders addressing each party's respective rights in the HBI proceeds. The court then issued an Order dated December 3, 2004, concluding that debtor has a superior interest in the proceeds and ordering the proceeds be delivered to debtor. Both rulings were on cross-motions for summary judgment. Progress appeals both Orders.

## III.    STANDARD OF REVIEW

Federal Rule of Bankruptcy Procedure 8013 provides that:

> On an appeal the district court or bankruptcy appellate panel may

---

[1] The Agreement states that it shall be governed and construed in accordance with the laws of the state of Alabama. (Agreement ¶ 9.) However, the local law of the jurisdiction in which the collateral is located governs perfection, the effect of non-perfection, and priority issues. Ala. Code § 7-9A-301(3); S.C. Code Ann. § 36-9-301(1). Thus, South Carolina law is applicable with respect to the respective parties' rights to the proceeds. Throughout both Orders the bankruptcy court applied either Alabama or South Carolina law, depending on the specific issue. On appeal, Progress does not allege that the bankruptcy court applied the wrong state's law. Therefore, this court will follow the bankruptcy court's lead in choice of law.

> affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree
> or remand with instructions for further proceedings.  Findings of fact,
> whether based on oral or documentary evidence, shall not be set aside
> unless clearly erroneous, and due regard shall be given to the opportunity
> of the bankruptcy court to judge the credibility of the witnesses.

Fed. R. Bankr. P. 8013 (West 2000).  Accordingly, appellate review by this court of findings of fact of the bankruptcy court is pursuant to the clearly erroneous standard.  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed."  United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).  The clearly erroneous rule will not protect findings based on the application of incorrect legal standards or made in disregard of applicable legal standards.  See Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1526 (4th Cir. 1984).  The bankruptcy court's conclusions of law are reviewed de novo.  See Traveler's Ins. Co. v. Bryson Properties, XVIII, 961 F.2d 496, 499 (4th Cir.), cert. denied, 506 U.S. 866 (1992) .

## IV.     ANALYSIS

Progress's appeal boils down to two fundamental issues, each with subsidiary questions of their own.  First, Progress challenges the bankruptcy court's determination that reclamation of the HBI is not an available remedy.  Within this issue, Progress contends that the transaction was actually a sale and not a consignment, and therefore reclamation was available.  Progress alternatively contends that reclamation is available even if the transaction was a consignment.

Second, Progress contends the bankruptcy court erred in determining that debtor's interest in the HBI is superior to its own interest in the proceeds.  The subsidiary issues

within this question concern the existence of debtor's interest in the HBI, whether Progress's interest was perfected, and the applicability of the bankruptcy code's "strong-arm" provision.

### a. Reclamation

The September Order held that the Agreement was a consignment under Article 9 and not a sale under Article 2. Part III of the December Order held that reclamation was not available for Article 9 transactions. Progress challenges both conclusions, and argues that even if the transaction is governed by Article 9, reclamation is available.

### i. Elements of Consignment

Initially, Progress contends that debtor cannot establish three of the elements of the statutory definition of consignment; i.e, (1) the goods were delivered to the merchant for purpose of sale; (2) the debtor deals in goods of that kind, and (3) the transaction does not create a security interest that secures an obligation. Ala. Code. § 7-9A-102(a)(20).

The parties cite numerous (and often, the same) cases in support of or challenging the bankruptcy court's conclusion that the HBI was delivered to debtor for "purpose of sale" because the material was an integral, incorporated part of the steel that debtor put on the market. (Sept. Order at 8.) However, Progress does not address the official comments and other commentary cited in the Order. As noted by the bankruptcy court, the official comment to the statutory provision defining consignment provides

> The definition of "consignment" requires that goods be delivered "to a merchant for the purpose of sale." If the goods are delivered for another purpose as well, such as milling or processing, the transaction is a consignment nonetheless because a purpose of delivery is "sale." On the other hand, if a merchant[] will not be selling the goods itself but will be delivering to buyers to which the owner[] agreed to sell the goods, the

transaction would not be a consignment.

Ala. Code § 7-9A-102, cmt. 14. The bankruptcy court also cited persuasive commentary regarding this aspect of the Uniform Commercial Code.

> If despite their processing and commingling the goods are to be returned to the owner and not sold to a third person, the transaction is not a consignment under the 1999 Article 9 . . . . If, on the other hand, the goods are to be processed and then sold by the processor to persons to be selected by him, the transaction is a consignment even though the processor is both processing and selling. In such cases, filing is required.

4 White & Summers, Uniform Commercial Code § 30-5 (5th ed., 2002). In the case at bar, "debtor processed the HBI delivered by Progress and incorporated the HBI into steel" sold by debtor. (Sept. Order at 8.) Since the official comments to the statute in dispute address the question of whether the HBI was "for purpose of sale," this court need not weigh into the thicket of competing interpretations. The court concurs with the bankruptcy court's determination that the HBI was delivered to debtor "for the purpose of sale."

Neither party cites controlling authority for the proposition that a party "deals in" goods it receives as raw materials for creation of another product. The bankruptcy court surveyed other jurisdictions and concluded that debtor did in fact "deal in" the HBI. Progress attempts to distinguish these cases; however, the court finds the debtor's position more persuasive. In BFC Chemicals Inc. v. Smith-Douglas, 46 B.R. 1009 (Bankr. E.D. N.C. 1985), the consignee purchased the agricultural chemical "toxaphene" to produce herbicides that it sold to third parties. In concluding that the consignee "dealt" in such goods, the court noted consignee

> dealt in agricultural chemicals, that toxaphene was a product used in the

6

> manufacture of agriculture chemicals, and would normally be expected to be in inventory for such a manufacturer. [Consignee] is not required to "sell" raw toxaphene to be a "dealer" in the kinds of goods involved, i.e., agricultural chemicals.

BFC Chemicals, 46 B.R. at 1019. As the bankruptcy court noted, the case at bar is analogous. In both, a debtor-consignee purchased goods from the creditor-consignor, processed and transformed the goods, and then resold the processed and transformed goods.

Progress contends BFC Chemicals is distinguishable because of the degree of similarity between the raw material and finished product. According to Progress, the consignee in BFC Chemicals "dealt" in the raw material because its finished product (agriculture chemicals) was substantially similar to the raw material (another chemical). In contrast, Progress contends the HBI was converted into a wholly different product. This court finds that distinction too thin an edge to skate. The statute requires only requires the consignee to "deal in goods of th[e] kind" delivered by the consignor to the consignee. As the bankruptcy court reasoned, debtor's use of HBI is sufficient to meet this test:

> In this case, debtor received the HBI from Progress, and through its manufacturing process, combined it with other materials to produce steel. HBI is a processed metal used to manufacture debtor's product and, in fact, is an integral component part of debtor's final product. Moreover, HBI appears to be a raw material normally maintained in the inventory of manufacturers such as debtor. Despite the fact that further processing of HBI is required to incorporate HBI into the steel that debtor sells, HBI is a component of the steel produced and sold by debtor; thus, it appears that debtor deals in goods of the kind delivered by Progress. Therefore, the court finds that debtor "deals in goods of the kind" for purposes of applying [the consignment statute] to the transaction between the debtor and Progress.

7

(Sept. Order at 10.) Other cases support this conclusion. See Pearson Industries v. McCord Auto Supply, 147 B.R. 914, 926 (Bankr. C.D. Ill. 1992) (rejecting argument that consignee was not a dealer of tires because it sold equipment that included tires, but not tires individually).

Finally, Progress contends debtor fails to meet Ala. Code § 7-9A-120(a)(20) because the Agreement grants Progress a security interest in the HBI. (Agreement ¶ 6.) However, § 7-9A-120(a)(20) requires that the "transaction . . . not create a security interest that secures an obligation" (emphasis added). In this context, a transaction is deemed to "secure an obligation" when there is a grant of security interest and a duty to pay for the unsold goods. See 4 White & Summers, Uniform Commercial Code 30-4 (5th ed. 2002) (duty must be to repay sum "whether or not the goods were sold"). However, the Agreement at bar stated that debtor only owed Progress a debt for the goods consumed. This court concurs with the bankruptcy court that the transaction did not create a security interest "that secures an obligation."[2]

      **ii.     Nature of Transaction**

Notwithstanding the elements of consignment, Progress maintains the nature of the transaction was more like a sale under Article 2 than a consignment under Article 9. Both parties agree that the proper test is to look at the "outwardly visible aspects of the transaction." Murphy v. SouthTrust Bank, 611 So.2d 269, 271 (Ala. 1992). Numerous aspects of the transaction validate the bankruptcy court's determination that the

---

[2] A security interest and a security interest that secures an obligation are distinct transactions. (See Sept. Order at 11.)

transaction is a consignment. For example, the Agreement was titled "Consignment Agreement" and identified the parties as consignor and consignee, and the HBI as consigned goods. Both debtor and Progress are sophisticated parties and presumably included this information for a purpose. Moreover, Progress's current position is belied by the fact that it drafted the Agreement. It is curious that Progress would include these titles and phrases yet not think the Agreement was a consignment.

Other aspects of the Agreement suggest it is not a sale. Official comment 6 to Ala. Code § 7-9A-109 notes that "in a 'sale or return' transaction, the buyer becomes the owner of the goods."[3] Numerous aspects undermine any contention that debtor became the owner of all the HBI. Progress retained title to all unconsumed HBI in possession of debtor. (Agreement ¶ 6.) Debtor became owner only after the HBI was removed and consumed. (Agreement ¶ 4.) Debtor had the option to purchase the unused HBI upon termination of the agreement. (Agreement ¶ 8.) Progress maintained direction and control over the HBI, and had the right to remove it at any time. (Agreement ¶¶ 3, 11.) As the bankruptcy court noted, if Progress sold the HBI to debtor and debtor became the owner of the HBI upon receiving the HBI from Progress, these provisions would be unnecessary. The court will not read the Agreement in the tortured manner purported by Progress, and concurs with the bankruptcy court's reasoning that the Agreement was a consignment.

---

[3] Ala. Code § 7-9A-109 addresses the scope of Article 9; comment six discusses consignments within this context, and differentiates them from sales.

### iii. Reclamation under Article 9

Progress also contends that reclamation is an available remedy regardless of the nature of the transaction.[4] However, Progress failed to properly state this issue on appeal. Generally speaking, "an issue first argued in a reply brief is not properly before a court of appeals." Cavallo v. Star Enterprise, 100 F.3d 1150, 1152 (4th Cir. 1996). Progress raised this issue for the first time in its reply brief. (See Def.'s Reply Br. at 1.)

Nonetheless, Progress's contention runs counter to fundamental policy considerations. Reclamation permits a seller who has discovered that the buyer has received goods on credit while insolvent to reclaim the goods upon demand made within ten days after receipt. S.C. Code Ann. § 36-2-702(2). However, Article 9 applies to consignments, and therefore such transactions are subject to that Article's filing and perfections requirements. See S.C. Code Ann. §§ 36-9-109(a)(4); 36-9-317; 4 White & Summers, Uniform Commercial Code § 30-4 (5th ed. 2002) ("a consignor must perfect a security interest under Article 9 to protect itself from the consignee's trustee in bankruptcy and from other and later perfected secured creditors"). As the bankruptcy court noted,

> if a consignor was able to exercise a right of reclamation and recover goods despite its failure to perfect its interest in the goods as required by the UCC, the perfection provisions of Article 9 and the rights granted to creditors of the consignee pursuant to [code sections discussing perfection of security interests] would be rendered meaningless.

(Dec. Order at 21.)    In sum, permitting Progress to reclaim the goods under Article 9

---

[4] Progress apparently made such an argument before the bankruptcy court: "Progress maintains that regardless of the nature of the transaction, it is entitled to exercise its right of reclamation under Article 2." (Dec. Order at 20.)

10

would undermine that article's filing and perfection requirements.

### b. Section 544

Progress challenges the bankruptcy court's finding that debtor could avoid Progress's interest in the HBI via the "strong arm" provision of 11 U.S.C. § 544. Within this issue, Progress contends the Agreement was terminated prepetition, that Progress did perfect its interest, and that § 544 does not apply in this circumstance.

#### i. Perfection of Progress's Interest

"The security interest of a consignor in goods that are the subject of a consignment is a purchase-money security interest in inventory." S.C. Code Ann. § 36-9-103(d). A purchase money security interest will take priority over the rights of the buyer, lessee, or lien creditor if a financing statement is filed "before or within 20 days after the debtor receives delivery of the collateral." S.C. Code Ann. § 36-9-317(e). If the consignor fails to perfect its interest in the consigned goods within the relevant time frame, the rights of the consignor in the goods are subordinated to the rights of lien creditors of the debtor. Id. Progress delivered the HBI to debtor beginning on October 10, 2003, and concedes that it never filed such a statement. Under the plain terms of § 36-9-317, Progress's interest is unperfected.

Nevertheless, Progress contends that the termination of the agreement negated its obligation to perfect is interest. This argument fails because the debtor's right to exercise its strong arm powers under § 544 arose at the moment of the filing of the bankruptcy petition. See 11 U.S.C. 544(a) (strong arm powers are applied at commencement of case). As discussed below, this court agrees with the bankrutpcy court that the

Agreement was not terminated at time of the petition. Therefore, the only action that would have impacted Progress's position after the bankruptcy filing was to file a financing statement, which it did not do. Progress simply failed to comply with the provisions of Article 9 to perfect is interest.

### ii.     Termination of Agreement

The Uniform Commercial Code specifically establishes the rights of a consignee and its creditors to the consigned goods:

> [F]or the purposes of determining the rights of creditors of, and purchasers for value of goods from, a consignee, while the goods are in the possession of the consignee, the consignee is deemed to have the rights and title to the goods identical to those the consignor had or had power to transfer.

S.C. Code Ann. § 36-9-319(a). The official comment to this section provides that for purpose of determining the rights of certain third parties, the consignee is deemed to acquire all the rights of the consignor if the consignor's interest is unperfected. Id., cmt. 2 ("The consignee acquires these rights even though, as between the parties, it purchases a limited interest in the goods (as would be the case in a true consignment, under which the consignee acquires only the interest of a bailee). As a consequence of this section, creditors of the consignee can acquire judicial liens and security interests in the goods.")

Progress contends that it terminated the Agreement prior to debtor's bankruptcy filing, and therefore, debtor's rights in the HBI under § 36-9-319 were terminated prior to the petition, and Progress did not need to perfect its security interest. This court adopts the bankruptcy court's analysis of this issue. The Agreement provided that Progress could terminate the Agreement at any time, "upon one day written notice." (Agreement

12

¶ 8.) Progress sent a written notice to debtor on October 20, 2003, stating that it was terminating the Agreement effective October 21, 2003. Debtor's petition was filed on October 21, 2003 at 9:00am. The bankruptcy court accurately noted that Alabama law recognizes fractions of a day when "determining the priority of judgment liens" or where justice requires it. See Dec. Order at 9 (citing Chadwick v. Colonial Life Ins Co., 124 So.2d 660, 661-62 (Ala. 1960)). As such, Alabama law requires a twenty-four hour period before the termination can be effective. Therefore, at the time of debtor's filing, the Agreement was not terminated because a full day had not yet passed.

### iii.     Application of Section 544

Section 544 of the bankruptcy code provides that the trustee is entitled to avoid any transfer of property that a perfected lien creditor could avoid. This "strong arm provision" places the trustee in the position of a hypothetical lien creditor and permits it to defeat unperfected security interests. 11 U.S.C. §544(a). The trustee exercising such power may also recover for the benefit of the estate any transfer so avoided. 11 U.S.C. § 550. Debtor, as debtor-in-possession of the HBI, has the same rights and powers as a trustee. 11 U.S.C. § 1107(a). As such, debtor is standing in the shoes of a hypothetical lien creditor. As the bankruptcy court concluded, debtor therefore has a superior interest in the HBI and takes priority over Progress as the consignor. "While a consignor that failed to protect its interest under . . . revised UCC § 9-102(a)(120) might prevail over a secured creditor of the consignee who had actual knowledge of the consignment, that consignor will not prevail over a trustee exercising its powers pursuant to" the strong-arm provision. In re Valley Media, 279 B.R. 105, 132 (Bankr. D. Del. 2002). This court

concurs with the bankruptcy court's analysis and conclusion:

> Progress failed to perfect its interest under the Agreement in the HBI because Progress did not file a financing statement as required under the Uniform Commercial Code. Therefore, Progress's security interest in the HBI is an unperfected security interest, subject to the rights of creditors, avoidable by debtor pursuant to its strong arm powers under § 544, and recoverable for the benefit of the estate.

(Dec. Order at 20.)

### V.     CONCLUSION

For the reasons stated above, it is therefore **ORDERED** that the bankruptcy court's Orders of September 30, 2004 and December 3, 2004 are **AFFIRMED**.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 15, 2005**
**Charleston, South Carolina**

14